## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

J.W., by his natural guardians and )
next friends, LARRY WARD and )
GAYLA WARD, )
       )
       **Plaintiffs,** )
       )
       **v.** )      **Case No.  09-2357-CM-DJW**
       )
**UNIFIED SCHOOL DISTRICT NO. 231,** )
**JOHNSON COUNTY, STATE OF KANSAS,** )
       )
       **Defendant.** )
       )

## MEMORANDUM AND ORDER

Plaintiffs Larry and Gayla Ward, as next friends of J.W., a child with autism, bring this action against defendant Unified School District No. 231, Johnson County, State of Kansas ("defendant" or the "District"), alleging a failure to provide free and appropriate educational services in violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1401 *et seq.* ("IDEA").  The claim is fully briefed and is now before the court on Defendant's Motion for Judgment on the Administrative Record (Doc. 32).  Having carefully reviewed the lengthy administrative record and the parties' briefs, the court determines that defendant is entitled to judgment.

I. **Factual Background**[1]

     A. **Background concerning J.W.**

---

[1]  The court has drawn the facts primarily from the Proposed Findings of Fact and Conclusions of Law submitted by the District to the hearing officer, (Admin. Doc. 49 at 2–8), which were ultimately adopted by the hearing officer.  (Admin. Doc. 53.)  Pursuant to Judge Waxse's scheduling order, the parties agreed to use, "to the greatest extent possible," the proposed findings of facts and conclusions of law submitted to the administrative hearing officer.  (Doc. 25 at 2.)  Plaintiffs' additional or different factual contentions, which appear in their response brief (Doc. 55) and in their original Suggested Findings of Fact and Conclusions of Law (Admin. Doc. 51), are included to the extent relevant.

J.W. was born in 2001 and was diagnosed with autism in 2003.  He is a student with a disability within the meaning of the IDEA.  At all pertinent times, J.W. resided with his parents, Larry and Gayla Ward ("parents"), within the boundaries of the District, which is a Kansas public school district, located in Johnson County, Kansas.

J.W. began receiving educational services from the District on October 22, 2004, pursuant to an Individualized Education Program ("IEP").  J.W. received educational services in his home during the summer of 2007.  Otherwise, J.W. received educational services from the District continuously between October 2004 and July 29, 2008, at which time his parents enrolled him at the Kansas City Autism Training Center ("KCATC").

J.W. attended school in the District for the entire 2006–07 school year.  The school year began with J.W.'s parents expressing concerns to the IEP team that J.W. was developing an increased occurrence of aggressive and self-injurious behaviors.  (Ex. 36–37.)  His 2006–07 IEP (Ex. 44) was originally developed on September 15, 2006.  It contained twenty (20) goals, and a Behavioral Intervention Plan ("BIP") for dealing with J.W.'s "aggression toward self or others [including] biting, kicking, scratching, head banging, slapping and hitting."  (Ex. 44, 45.)  Positive behavioral supports included break time with reinforcing activities, and token reinforcement during work-time.  (Ex. 45.)

The IDEA requires that IEPs be reviewed "periodically, but not less frequently than annually" to determine the child's progress toward his IEP goals and whether the IEP should be revised.  20 U.S.C. §1414(d)(4).  In J.W.'s case, the District conducted meetings on roughly a monthly basis to review J.W.'s progress.  (Ex. 46, 48, 56, 60, 61, 69, 71 and 80 include the Staffing Committee Notes from those meetings during the 2006–07 school year.)

At a December 15, 2006, meeting, the team discussed J.W.'s progress on certain IEP goals. Certain goals—4, 8, and 13—were discontinued.[2]  New goals were added—21 and 22.  (Ex. 56–57.) A crisis procedure for handling "rage incidents" was added to J.W.'s BIP: this involved having J.W. sit in a beanbag chair until he was calm, and was used during non-instructional time.  (Ex. 45, 58.)

At about this time, J.W. transitioned from the early childhood classroom at Madison Elementary to the communications classroom at Gardner Elementary, both within the District.

As of April 2007, J.W.'s parents raised some concerns about J.W.'s behaviors as documented in two videos.  (Ex. 225, 226.)  J.W.'s parents were surprised and concerned by the videos; the behaviors seen in the videos were more severe or more frequent than the parents expected based on communication with the team and the daily data sheets being sent home with J.W.  These videos show J.W. exhibiting self-injurious behaviors such as biting his hands, scratching, slapping surfaces, slapping his hands, and slapping his head.  At an April 25, 2007 IEP meeting, the parents expressed their concerns.  In response, Linda Scott, the District's autism consultant, observed J.W.'s behaviors in order to prepare a new draft BIP.

J.W.'s IEP was revised in May 2007, with some goals being discontinued and new goals being added.  (Ex. 82.)  Also, the team discussed using immediate reinforcement rather than token reinforcement, and reducing the sensory distractions in the classroom environment.  Additionally, team notes indicate a need to clarify how data regarding self-injurious behaviors was being documented.  The team discussed inter-rater reliability of data to determine if the team could rely on

_____

[2]  Notes contained in Exhibit 56 indicate Goal 4 (block imitation) was discontinued but do not indicate why.  Goal 8 (imitate motor activities) was discontinued with a note to see Goal 20; Goal 13 (counting) was discontinued with a note that staff was "seeing self-injury," "add more less goal."  Goal 14 (addition) was modified (to remove condition of manipulatives), and Goals 21 (more or less) and 22 (two-step directions) were added.

the data in order to determine J.W.'s present levels of behavior in developing his new IEP. The parents requested the District retain a PhD consultant and/or consider placing J.W. outside the District. The parents did not consent to the IEP team's proposed BIP dated May 23, 2007, because they believed the team needed to consult an autism expert.

J.W. did not attend the District's Extended School Year program in the summer of 2007. Instead, he received home programming and services through a clinic run by Nancy Champlin, a board-certified behavior analyst. According to Mrs. Ward, J.W. worked on only some of his IEP goals through the summer. Of the goals J.W. did work on that summer, many were presented or programmed differently from how they had been taught by the District. He also did not receive any services from a speech pathologist over the summer.

Testimony was presented that, when J.W. returned to the District in the fall of 2007, he was not performing at the same level as when the 2006–07 school year had ended. Although he had maintained some skills, he had regressed on others, and staff continued to work with him to regain those lost skills. Developing a new IEP for the 07–08 school year proved to be a lengthy and difficult endeavor due to disagreements relating to how the District would handle J.W.'s behaviors. The parents wanted the team to adopt or implement the BIP prepared by Dr. Patricia Meinhold, an autism consultant they had independently hired to observe and report on J.W. During this time, staff continued working with J.W. on the goals from his 06–07 IEPs, and added new targets for J.W. to work on within many goals.

At the beginning of the 2007–08 school year, the District retained Dr. Paul LaCava, an autism specialist, to observe and report on J.W.'s behaviors. At an August 29, 2007, IEP meeting, a draft IEP was presented. At the October 3, 2007, meeting, the team added a behavior goal to the draft. (Ex. 114.) Dr. LaCava presented his report at the October 26, 2007 and November 14, 2007 IEP

-4-

meetings.  (Ex. 151.)  A new IEP with BIP was approved on Dec. 5, 2007, and was implemented in January 2008.  (Ex. 167.)  J.W.'s parents enrolled him at KCATC in July 2008.

**B.**     **Identification and Background of Witnesses** (Admin. Doc. 49 at 3–5.)

The District served J.W. through a number of certified teachers and related services personnel. From October 2004 until January 2007, he was taught by Sara Barth.  Ms. Barth has a bachelor's degree in psychology, and a master's degree in early childhood education and early childhood special education.  She has been certified to teach special education in Kansas since 1999.

Gena Rossow is licensed to practice speech and language pathology by Kansas and Missouri. She has a bachelor's degree in communications sciences and a master's degree in speech-language pathology.  She provided speech and language services to J.W. during the summer of 2006, and also during the 2006–07 school year as J.W. gradually transitioned from the early childhood classroom at Madison Elementary School to the communications classroom at Gardner Elementary, where Ms. Rossow was assigned.

To the extent J.W. received speech and language services during the 2006–07 school year while he was at Madison Elementary, they were provided by Jennifer Hoss, another speech-language pathologist employed by the District.

The District's communications classroom was for children with deficits in one or more areas of communication.  One of the characteristics of autism is a deficit in communication skills.  An inability to communicate one's wants and needs can lead to frustration that manifests itself in behavioral problems.  There were three other students besides J.W. in the communications classroom during the 2006–07 school year, and all of those students had autism.  The role of a speech-language pathologist is to teach children how to communicate so that their maladaptive behaviors can be replaced with communication.

During the time J.W. spent at Gardner Elementary during the 2006–07 school year, his special education teacher was Danielle Stowell, who was certified to teach special education.

J.W.'s special education teacher for 2007–08 was Ashley Arnold.  Ms. Arnold has a bachelor's degree in K-6 special education and K-6 general education, along with a master's degree in collaborative teaching and learning.  She is certified in Kansas to teach both regular and special education for students from kindergarten through the ninth grade.  She taught kindergarten for one year, the first grade for four years, and then took over the communications classroom in the 2007–08 school year.  While teaching kindergarten and first grade she had a student with autism in her classes.

Linda Scott is the District's autism/behavior consultant, and was assigned to J.W.'s IEP team beginning in September 2006.  Ms. Scott has an undergraduate degree in elementary education, and a master's degree in behavior disabilities with an emphasis in Autism Asperger Syndrome.  She is certified in Kansas to teach both regular and special education.  She taught first grade for three years, and then taught in the District's communications classroom for three years after that.  Ms. Scott consulted with District personnel and other members of the IEP team regarding J.W.'s case from September 2006 onward.  Plaintiffs assert Ms. Scott was not involved enough in IEP planning or implementation, and failed to provide consultation and training to staff regarding the correct implementation of behavior intervention strategies until the videos of April 2007 revealed the magnitude of J.W.'s problems.  (*See* Doc. 55 at 1–3.)

Dr. Jody Marshall was the other District employee who testified at the hearing.  Dr. Marshall has a bachelor's degree in psychology, two master's degrees in educational psychology, and a Ph.D. in school psychology.  Dr. Marshall became the District's Assistant Director of Special Services as of the 2008–09 school year, and prior to that time had served as a Special Services Coordinator for

the District, in which capacity he provided support for special education programming in certain of the District's buildings.  Dr. Marshall was not involved in the direct delivery of educational services to J.W., but facilitated meetings and paperwork associated with J.W.'s case.

Gayla Ward, J.W.'s mother, testified for all or parts of seven days.  Mrs. Ward has a college degree in medical technology.  She took no education courses in college, and has taken none since obtaining her undergraduate degree.  Her experience in a classroom (other than as a student) was when she spent part of a year as a teacher's aide in her daughter's kindergarten classroom.  At numerous times during the development of J.W.'s IEPs, she stated that she lacked the expertise to know whether J.W.'s IEPs were appropriate.  Plaintiffs assert that Mrs. Ward, along with infant/toddler service providers, did receive training from Nancy Champlin in early 2004 to establish a home program for J.W.  Mrs. Ward also trained with Sara Barth in order to provide continuity between the school program and home program.  (*See* Doc. 55 at 3.)

Plaintiffs' expert witness was Dr. Patricia Meinhold.  Dr. Meinhold has undergraduate, master's, and doctoral degrees in psychology.  She emphasized applied behavioral analysis and child development in obtaining her doctorate.  She is licensed to practice psychology in several states, including Kansas, but has no degrees in education and is not certified to teach in any state.  Plaintiffs additionally note that Dr. Meinhold has participated on IEP teams and has consulted with school districts for children with autism on developing and interpreting BIPs.  (*See* Doc. 55 at 4.)

Plaintiffs also introduced testimony from Dr. Jennifer Simon.  Dr. Simon was the program director at KCATC, where she provided staff and parent training, developed the programming and curriculum for students at KCATC, and was responsible for the administrative functions of KCATC.  Dr. Simon has an undergraduate degree from the University of Kansas Department of Human Development, a master's degree in behavioral science and a doctorate in behavioral psychology.  Dr.

Simon has no degrees in education, and is not certified to teach by any state.  Plaintiffs assert that the Kansas State Department of Education ("KSDE") recognizes Dr. Simon as a special teacher based on her certification as a board-certified behavior analyst.  (*See* Doc. 55 at 5; Tr. at 1819.)

### C.   Procedural History and the Hearing Officer's Report (Admin. Doc. 49 at 6–8.)

Plaintiffs sought a state due process hearing on March 13, 2008.  During the discovery period, defendant filed a motion to dismiss the complaint and plaintiffs filed a motion to amend the complaint.  The hearing officer denied both motions.  On the issues properly raised in plaintiffs' complaint,[3] a due process hearing was held in five sessions over the course of sixteen days: October 13–16; October 20–22; November 6–7; November 13–14; and December 1–5, 2008.  During the hearing, exhibits were introduced and received into evidence.  Both parties rested their cases on December 5, 2008.  The deadline for post-hearing briefing was, after a number of requests for extensions, set at March 16, 2009.  On March 29, 2009, the hearing officer issued a report finding that plaintiffs had failed to meet the burden to show that J.W. was denied a free and appropriate public education ("FAPE").  (Admin. Doc. 53.)  As required by Kansas law, plaintiffs timely requested review of the hearing officer's decision by a review officer appointed by the KSDE.  Kan. Stat. Ann. § 72-974(b).  The KSDE review officer affirmed the hearing officer's decision on June 4, 2009.  Plaintiffs then filed this action seeking judicial review of the administrative decision.

Plaintiffs argue that the design and implementation of IEPs for the 2006–07 and 2007–08 school years denied J.W. a FAPE.  Plaintiffs argue that, based on this violation of the IDEA, they are entitled to compensatory education for two years at KCATC, reimbursement for the expense of

---

[3]  The hearing officer issued an order finding that plaintiffs were not entitled to a hearing on Problems 5 and 6 of their due process complaint because they failed to comply with the requirements of Kan. Stat. Ann. § 72-972(a)(1)(B).

educating J.W. at KCTAC for the 2008–09 school year, and for other relief.

## II.    IDEA

The IDEA was designed to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A); *see also Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1235–36 (10th Cir. 2009).

To provide a FAPE to an eligible student, states must develop an IEP for that child.  *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1043 (10th Cir.1993); *see* 20 U.S.C. § 1412(a)(4) (instituting IEPs).  The IEP must "[set] forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals."  *Romer*, 992 F.2d at 1043.  IEPs must be reviewed at least annually and revised as appropriate.  20 U.S.C. § 1414(d)(4).  For the special education and related services provided to a student to constitute a FAPE, they must be "provided in conformity with the [IEP]."  *Id*. § 1401(8)(D).

Before a party can file suit in federal court, it must exhaust the administrative remedies set out in the Act.  20 U.S.C. § 1415; *see also Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1267–70 (10th Cir. 2007).  There is no suggestion here that plaintiffs failed to exhaust appropriate administrative remedies, so the court turns directly to the merits of the action.

## III.    Judicial Review under the IDEA

The IDEA directs this court to independently review the administrative record, hear additional evidence if necessary, and apply a preponderance of the evidence standard to decide if the requirements of the IDEA have been met.  *See* 20 U.S.C. § 1415(i)(2);  *Sytsema ex rel. Sytsema v.*

*Academy Sch. Dist. No. 20*, 538 F.3d 1306, 1311 (10th Cir. 2008).[4]  In doing so, the court must "give

'due weight' to the hearing officer's findings of fact, which are considered prima facie correct." *Id.*

(citing *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004)).  Under this

"modified de novo" review standard, the court must not substitute its own notions of preferable

education policies.  *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176,

206–07 (1982); *Murray ex rel. Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th

Cir. 1995).

 Here, the court considers the parties' briefing, the voluminous administrative record, and also

the documents or portions of documents identified in the court's order dated March 31, 2011,

granting in part and denying in part plaintiffs' Motion to Receive Additional Evidence (Doc. 28).[5]

 The Supreme Court has outlined a two-step inquiry for assessing liability under the IDEA.

*Rowley*, 458 U.S. at 206–07.  First, the court asks whether the school district complied with the

procedures set forth in the IDEA, that is, whether the IEP development process complied with the

Act.  The court then determines whether the special education services provided to the student were

reasonably calculated to enable the child to receive educational benefits, or in other words, whether

the IEP substance provided the student with a FAPE.  *Garcia v. Bd. of Educ. of Albuquerque Publ.

Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008); *Sytsema*, 538 F.3d at 1312.

---

 [4]  The Individuals with Disabilities Education Improvement Act of 2004, which took effect
on July 1, 2005, applies to this claim.  *See* Pub. L. No. 108-446, 118 Stat. 2647.

 [5]  These include Exhibit 34 (document dated September 9, 2005, and containing an
Individualized Education Program (IEP) and various skill assessments and data on plaintiffs'
progress); pages two and three from Exhibit 136 (containing a series of notes and emails between
defendant and plaintiff's parents marked with dates between September 6, 2007 and October 2,
2007); and Exhibit 201 (the written report of plaintiffs' expert witness, Dr. Patricia Meinhold) except
for its last page (an email from Dr. Meinhold, authored several months after the report.)

The party attacking a child's IEP bears the burden of proof to show why the IEP is inadequate or did not provide the child with educational benefit. *Johnson v. Indep. Sch. Dist. No. 4 of Bixby, Tulsa Cnty., Okla.*, 921 F.2d 1022, 1026 (10th Cir. 1990).

**IV.   Issues**

The issues raised by plaintiffs before the hearing officer—and discussed in briefing—were as follows:

1.   Did the District's 2006 reevaluation of J.W. comply with the requirements of the IDEA?

2.   Were J.W.'s 2006–07 and 2007–08 IEPs properly developed so that they would be reasonably calculated to result in educational progress for J.W.?

3.   Were J.W.'s 2006–07 and 2007–08 IEPs properly implemented by the District?

4.   Was the District required to create a "transition plan" for J.W.'s transition from Madison Elementary School to Gardner Elementary School, both of which are District facilities?

Also, although not specifically called into question by plaintiffs' administrative complaint, another issue was presented by the evidence and briefed by the District because of its relationship to the other issues raised by plaintiffs:

5.   Did J.W. make meaningful educational progress in the District during the 2006–07 and 2007–08 school years?

The court does not follow the organizational structure of the briefing, but instead addresses the issues in the manner it is charged to under the IDEA.  It first briefly addresses plaintiffs' suggestion that the hearing officer improperly relied on the District's—rather than plaintiffs'—witnesses.  The court then looks to whether the IDEA's procedural requirements were met as to the 2006 evaluation and the development of the 2006–07 and 2007–08 IEPs.  Next, the

-11-

court evaluates whether the IEPs were implemented in accord with the IDEA, that is, whether services provided to J.W. were reasonably calculated to enable him to receive educational benefits. Subsumed in this inquiry is the additional issue presented to the hearing officer and which comprises the majority of the evidence and briefing: whether J.W. made meaningful educational progress. Plaintiffs have abandoned their argument that the District was required to implement a transition plan for J.W.'s transition from Madison Elementary School to Gardner Elementary School.  (Doc. 55 at 84.)

The court notes that this case is among the most disorganized and unwieldy it has encountered.  The court found it challenging to set out a straightforward chronology of relevant factual events from the materials submitted.  And, despite the fact that plaintiffs bear the burden here, plaintiffs' substantive arguments are difficult to follow.  After reviewing all the evidence, including three DVDs of J.W. in the classroom; sixteen recorded IEP meetings; approximately 200 exhibits; over 2300 pages of transcript from the sixteen days of proceedings; the hearing and reviewing officers' reports; and the briefing in this case, the court finds that plaintiffs fail to establish that J.W. was denied a FAPE.

**V.     Analysis**

   **A.     Did the Hearing Officer Improperly Rely on the District's Witnesses?**

First, plaintiffs argue that the hearing officer inappropriately relied primarily on defendant's witnesses when rendering her decision.  Plaintiffs point to five reasons why this reliance was inappropriate: (1) the District's witnesses maintained that J.W.'s behaviors did not interfere with his ability to attend to and benefit from the programming he was receiving at the school, despite "credible evidence to the contrary"; (2) the District did not have a behaviorist with the expertise or

experience necessary to manage, develop, and implement a functional behavior assessment and behavioral intervention plan, and to coordinate those with the presentation of programming required by J.W.'s behaviors; (3) the District denied that J.W.'s behaviors increased in frequency and topography despite credible evidence — physical, documentary, and testimonial—that J.W. was regressing; (4) the District asserted (during the implementation of programming, at the hearing, and in the present motion for judgment) that in the fall semester 2007 it was implementing mastered programming from J.W.'s 2006–07 IEPs, when in fact it was not; and (5) the District's assertion that it was taking data in "clusters" is contradicted by substantial evidence.

Most of these arguments require the court to reevaluate the facts and the credibility of witnesses.  But the hearing officer's findings of fact are considered prima facie correct, and the court gives them "due weight."  *See Sytsema*, 538 F.3d at 1311.  The fact that there is a genuine dispute as to whether J.W.'s behaviors were increasing, or whether they interfered with his education does not render those findings and conclusions suspect.  And regardless, substantially similar arguments form the basis of plaintiffs' IDEA challenge.  The court will therefore addresses plaintiffs' arguments as they arise in the IDEA claim.

### B.   Compliance with Procedural Requirements

The IDEA requires that certain individuals be involved in the evaluation of the child and in development of the IEP.  The IDEA requires that an IEP set out the student's present level of performance; contain a statement of annual goals; and list short-term instructional objectives and steps for bringing the present level of performance in line with the goals.  *See* 34 C.F.R. § 300.347 (effective to Oct. 12, 2006);  34 C.F.R.  § 300.320 (effective Oct. 13, 2006–Oct. 29, 2007).[6]  The IEP

_____

[6]  As noted, there are at least two and possibly three versions of regulations applicable to the
(continued...)

must also set out specifically what related services the student is to receive. *See, e.g., O'Toole*, 963 F. Supp. at 1012–14.

Deviations from the procedural requirements of developing an IEP do not automatically lead to the conclusion that the IEP is invalid. *Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720, 726 (10th Cir. 1996). Rather, the court must determine whether any procedural error resulted in substantive harm to the child or his parents, deprived an eligible student of an individualized education program, or resulted in the loss of an educational opportunity. *Sytsema*, 538 F.3d 1306, 1313; *see also O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 707 (10th Cir. 1998) (noting that procedural inadequacies must have "'compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.'").

Plaintiffs allege that procedural error in the 2006 reevaluation, and the 2006–07 and 2007–08 IEPs resulted in denying J.W. a FAPE.

1. **Did the District's 2006 reevaluation of J.W. comply with the requirements of the IDEA?**

*a. Did the District's failure to perform a FBA violate IDEA requirements?*

Federal regulations require that a student be "assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 34 C.F.R. § 300.304(c)(4) (current); 34 C.F.R. §300.532(g) (prior version). The fundamental purpose of such an

---

[6] (...continued)
IEPs at issue here. Where they are substantively different, the court notes such. Otherwise, the court will cite to the applicable section of the regulations in effect at the pertinent time.

evaluation is to provide information needed to determine "the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum, or for preschool children, to participate in appropriate activities." 20 U.S.C. § 1412(b)(2)(A); *see* 34 C.F.R. § 300.304 (b)(ii).  Reevaluation must be in accord with the appropriate federal regulations.  20 U.S.C. § 1414(a)(2); 34 C.F.R. § 300.304 through 300.311 (effective Oct. 13, 2006); 34 C.F.R. §§ 300.532 through 300.535 (effective through Oct. 12, 2006).

It is undisputed that the District used two assessment tools in the course of conducting the 2006 evaluation: the Psychoeducational Profile Revised (PEP-R) (Ex. 41) and the Assessment of Basic Language and Learning Skills (ABLLS) (Ex. 682), and that J.W.'s mother was consulted in connection with the PEP-R test.  It is also undisputed that the District did not perform a functional behavior analysis ("FBA") at that time.  Plaintiffs concede that the District's evaluation addressed J.W.'s domains of learning, but failed to address his behavior and thus was not proper.  Plaintiffs argue that the "complex, multi-functioned and pervasive nature of [J.W.'s] behaviors necessitated a carefully considered [FBA] to develop an appropriate [BIP]."  Specifically, plaintiffs assert that because the District failed to perform a FBA as part of the 2006 reevaluation, J.W.'s behaviors evolved and regressed to such an extent that they severely interfered with his ability to attend to and receive benefit from his educational programming, denying him a FAPE.  (Doc. 55 at 59.)

Plaintiffs challenge the District's assertion that no FBA was required as part of the reevaluation.  In support, they point to "the only credible evidence presented to the hearing officer on this issue, from Drs. LaCava, Meinhold and Simon," all of whom "concluded that J.W.'s behaviors interfered with his ability to attend to and receive benefit from his educational programming," that

J.W. needed a BIP, and that a FBA was the appropriate mechanism by which to develop such a plan. *Id*.  Plaintiffs also rely on *Harris v. District of Columbia*, 561 F. Supp. 2d 63 (D.D.C. 2008).

In *Harris*, the school district performed a FBA for the eligible child, but her mother believed it was inadequate and, nearly one year later, the mother requested funding for an independent FBA. The school district failed to act on the request.  At the administrative hearing and before the district court, the parties disputed whether a FBA was a "educational evaluation" as contemplated in 34 C.F.R. § 300.502.  The school district argued that it was not, because it was merely a tool for addressing behavioral, not educational problems.  The court rejected this argument, and agreed with the mother that a FBA constitutes an "educational evaluation" for purposes of IDEA regulations.  In so holding, the court stated:

> The FBA is essential to addressing a child's behavioral difficulties, and, as such, it plays an integral role in the development of an IEP.  [(citing plaintiff's brief).]  As shown in the FBA of [the child] performed by [the school district], the information gleaned from the assessment is central to formulating an IEP tailored to the needs of individual disabled children.  [(citing plaintiff's brief).]  The FBA's fundamental connection to the quality of a disabled child's education compels this Court's determination that an FBA is an "educational evaluation" for purposes of [34 C.F.R.] Section 300.

561 F. Supp. 2d at 68.  The court ultimately held that the school district's failure to act on the request deprived the child of a FAPE because it resulted in her "languish[ing] for over two years" without an IEP sufficiently tailored to her special needs.  The present case is distinguishable in that here, unlike in *Harris*, there is no suggestion that the parents sought and were denied a FBA at the time of the reevaluation.

The court nevertheless evaluates whether, under the circumstances of this case, the failure to perform a FBA constituted a procedural violation of the IDEA.  In conducting evaluations, the IDEA requires the district to "use a variety of assessment tools and strategies to gather relevant functional,

developmental, and academic information" to assist in determining the content of the child's IEP.

But the IDEA instructs that the district shall "not use any single measure or assessment as the sole

criterion" for determining an appropriate IEP.  20 U.S.C. § 1414(b)(2)(A) & (B).  "In the case of a

child whose behavior impedes the child's learning," the IDEA requires the IEP team, in developing

the IEP, to "consider the use of positive behavioral interventions and supports, and other strategies,

to address that behavior."  34 C.F.R. § 300.324(a)(2)(i).  However, there is no requirement that a

particular assessment tool be employed in evaluating a child.  This court will not impose that

requirement.  Thus, the court finds no procedural violation of the IDEA in the 2006 reevaluation.

*See M.N. v. New York City Dept. of Educ., Reg. 9 (Dist. 2)*, 700 F. Supp. 2d 356, 366 (S.D.N.Y.

2010) (holding that failure to conduct a FBA does not necessarily render an IEP procedurally

inadequate under the IDEA, where the IEP provides strategies to address the student's behavior);

*Cnty. Sch. Bd. of Henrico Cnty., Vir. v. Palkovics*, 285 F. Supp. 2d 701, 709 (E.D. Va. 2003)

(holding failure to include BIP in IEP for autistic child who might need such intervention did not,

without more, deprive child of a FAPE; deprivation would have occurred only if such a plan was not

added to the IEP once a need for intervention was demonstrated), *rev'd & remanded on other*

*grounds*, 399 F.3d 298.

Even if the failure to conduct a FBA constituted a procedural violation, plaintiffs fail to

establish that such defect affected J.W.'s substantive rights or otherwise resulted in an educational

harm.  It is undisputed that the District had conducted a FBA in November 2004 (Ex. 15), shortly

after J.W. began receiving early childhood services in the District.  That FBA concluded that there

were multiple functions to J.W.'s aggressive behaviors, including a desire to get something, a desire

to get out of something, and a lack of skill or ability to do a task that was requested of him.  (*Id*. at

2.)  By September 2006, Ms. Barth (who had by then worked with J.W. for nearly two years) believed that "the functions of his behaviors. . . had not changed."  (Doc. 49 at 47; Tr. 1898.)  Ms. Barth and Ms. Scott both testified that at least one of the functions of J.W.'s behavior was task avoidance, and his behaviors were also likely a product of his inability to communicate.  (Tr. at 1613–15, 1665; 1863–64; 1927–28.)  Dr. Meinhold's 2007 Functional Assessment Report states that J.W.'s self-injurious and aggressive behavior functioned "as a means of avoiding, delaying, or ending a demand by an adult"; as a means of getting something, such as tangible or edible items, or assistance or attention; and/or as a means of sensory input.  (Ex. 116.)  Plaintiffs do not clarify how these functions are substantively different than those identified in the November 2004 FBA.  But even assuming without deciding that the functions of J.W.'s aggressive behaviors had changed, plaintiffs fail to establish that the District's failure to perform a FBA during the 2006 reevaluation resulted in denial of a FAPE.

> *b.  Did the 2006 evaluation team lack the personnel required by the IDEA?*

Plaintiffs also maintains that, because Ms. Scott was the only behavior consultant for the District and on the IEP team, the 2006 evaluation lacked the proper personnel under the IDEA. (Doc. 55 at 60, referring to Doc. 55 at 9–11.)  Plaintiffs' argument is unclear, but defendant suggests the argument may be based on language requiring a "multi-disciplinary team."  *See Logue v. Shawnee Mission Sch. Dist.*, 959 F. Supp. 1338, 1348 (D. Kan. 1997) (quoting then-34 C.F.R. § 300.532(e), which at that time required that evaluations be conducted by a "multidisciplinary team or group of persons, including at least one teacher or other specialist with knowledge in the area of suspected disability.")  That requirement is absent from the applicable regulations.  *See* 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321 (effective Oct. 13, 2006); 34 C.F.R. § 300.344 (effective through

Oct 12, 2006).  And in any case, the individuals involved in the evaluation were drawn from a wide variety of disciplines, and included at least one autism specialist: Ms. Scott.[7]  The makeup of the reevalution team complied with the IDEA.

### 2.        Did J.W.'s 2006–07 and 2007–08 IEPs comply with the IDEA?

The court must determine whether the IEPs were developed in manner reasonably calculated to result in educational progress for J.W.

In developing J.W.'s IEPs, the District was required to consider (1) J.W.'s strengths; (2) the concerns of J.W.'s parents for enhancing his education; (3) the results of J.W.'s initial evaluation or most recent evaluation; and (4) J.W.'s academic, developmental, and functional needs.  20 U.S.C. § 1414(d)(3)(A).  Additionally, the District was required to consider the use of positive behavioral interventions and supports and other strategies to address behaviors that impeded J.W.'s learning.  20 U.S.C. § 1414(d)(3)(B)(i).  Simply put, a review of all the evidence suggests that the District did each of these things, and plaintiffs fail to establish otherwise.  A more detailed discussion of plaintiffs' points of error follows.

### a.        Based on flawed data?

First, plaintiffs assert the IEPs were inappropriately developed because they were based upon flawed data or no data.  Plaintiffs' argument on this point is unclear, but a review of the evidence does not support plaintiffs' contention that the IEPs were based upon flawed data or no data.  The evidence and testimony suggests that, at least in April 2007 when J.W.'s parents raised concerns,

---

[7]  Exhibit 41 reflects that the PEP-R was administered by J.W.'s early childhood teacher, Sara Barth; the District's Autism Consultant, Linda Scott; and Karen Stueve, the paraprofessional who had provided J.W. with in-home programming and who worked with him throughout the time he received services in the District.  (Tr. 1845–47.)   Exhibit 40 indicates that the final report on J.W.'s reevaluation was agreed to by Ms. Barth; Mrs. Ward; Hillary Brunin, an occupational therapist; Christi Whitter, the school principal; and Jennifer Hoss, a speech-language pathologist.

there was uncertainty as to whether the team was recording the incidence of J.W.'s self-injurious behaviors—particularly hand-biting—by frequency (where one bite counts as one) or in clusters (where fits of self-injurious behaviors—which may involve more than one bite—count as one). This raised questions about whether the team was counting those times when J.W. put his hand to his mouth but did not bite it; and whether the team was counting those times when J.W. attempted to put his hand to his mouth but was prevented from getting his hand to his mouth.

Mrs. Ward believed that, at least prior to April or May 2007, data for self-injurious behaviors was being recorded by frequency—where each action counts as one. (Tr. at 266.) At a May 9, 2007, IEP meeting, Ms. Scott explained to Mrs. Ward that the reason the data sheets' behavior tallies did not match up with what Mrs. Ward saw on the videos was because data was being recorded in clusters. (Tr. at 348, 1615–18.) Ms. Scott testified that, since she had started on J.W.'s IEP team in September 2006, the data had always been taken as a cluster count. (Tr. at 1615.) Ms. Barth testified, however, that while she was J.W.'s case manager, she attempted to take behavior data by frequency count, and would note episodes or clusters. (Tr. 1902, 1908–09.)

The team agreed that there needed to be consistency in how data was gathered, and ultimately decided, based on the parents' concerns, they would switch to a frequency count rather than taking data in clusters. (Tr. at 369, 1618.) Ms. Scott testified that the data being taken was accurate, and she agreed with the method of taking data. (Tr. 1627.) Ms. Barth also testified that she believed the data collected while she was involved with J.W.'s IEP was accurate. (Tr. 1908, 1984.) The team performed inter-rater reliability and determined that the behavior data was reliable. It is clear J.W.'s parents felt that communication was not as good with the Gardner Elementary IEP team as it had been with the Madison Elementary IEP team, and that, at some point in 2007, J.W.'s parents lost

confidence and trust in the team.  (Tr. at 744, 1134–36, 1434–35.)  However, plaintiffs' argument

that the IEPs were based on flawed or no data is not supported by the evidence.

Moreover, plaintiffs fail to establish that any inconsistencies or glitches in data collection

resulted in substantive educational harm to J.W.  To the contrary, the evidence establishes that the

team responded appropriately to the parents' concerns and took efforts to evaluate their data

collection methods to ensure that the data gathered was accurately reflecting J.W.'s present levels of

performance for the purpose of properly developing his programming.

> b.      *Ms. Scott unqualified to perform FBA, create BIP, or develop IEP?*

Second, plaintiffs assert that Ms. Scott lacked necessary qualifications and training to

perform a FBA, create a BIP, and create an IEP designed to confer educational benefit to J.W. "in

recognition of his complex and multi-functional behaviors."  (Doc. 55 at 63.)   Plaintiffs fail to offer

any authority or evidence in support of their argument, however.  As noted above, Ms. Scott has an

undergraduate degree in elementary education, and a master's degree in behavior disabilities with an

emphasis in Autism Asperger Syndrome.  She is certified in Kansas to teach both regular and special

education.  She was assigned to J.W.'s IEP beginning in September 2006, and consulted with

District personnel and other members of the IEP team regarding J.W.'s case from September 2006

onward.  Although admittedly she did not participate in monthly IEP team meetings or conduct

formal observations of J.W. until the parents raised concerns in April 2007, she testified that she was

in-and-out of the communications classroom on a regular basis; she casually observed J.W.

throughout the relevant time period; and she consistently consulted with staff working with J.W.

during that time.  (Tr. 1551–53.)  (*See* Doc. 55 at 1–3.)  The court will not speculate as to what might

form the basis of plaintiffs' argument.

c.      *Behavioral supports incorrectly implemented or ineffective?*

Third, plaintiffs argue that the positive behavioral supports included in the IEPs were implemented incorrectly or were ineffective and did not benefit J.W.  Plaintiffs point to *B.H. v. W. Clermont Board of Education*, 788 F. Supp. 2d 682 (S.D. Ohio 2011), and *Covington v. Yuba City Unified School District*, 780 F. Supp. 2d 1014 (E.D. Cal. 2011), for the proposition that "such a pervasive and escalating occurrence of behaviors uncontrolled by the strategies developed and implemented by the District must, as a matter of law, amount to a denial of [a] FAPE."  (Doc. 55 at 65.)

The court finds these two cases to be factually distinguishable from this one.  In *B.H.*, the school district did not consider using positive behavioral interventions in addressing the student's escalating behaviors; instead, the school district employed a point system to reward positive behavior, but the point system had no scientific basis and was inconsistently applied.  788 F. Supp. 2d at 697–99.  Additionally, it was clear that the student, who had a cognitive deficit, did not understand the point system.  *Id.*  And to deal with negative behavior, the school district used physical restraints that were shown to be unnecessary and ineffective, and the student's teacher was unduly punitive with her—punishing her for behavior related to her disability.  *Id.*  In *Covington*, the court found that the student was denied a FAPE in violation of the IDEA where the school district refused to consider changing its previous placement offer despite growing evidence of the student's deterioration: within two months the student had run away from school five times; his behavior was fluctuating; he was growing increasingly defiant; and he was not responding to strategies and interventions that had been successful in the past.  780 F. Supp. 2d at 1017–18, 1022–23.

If a child's behavior interferes with his learning or the learning of others, the IDEA requires

-22-

the IEP team to "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." In *B.H.* and *Covington*, the defendant school districts fell short of this standard. Here, however, the evidence establishes that the District not only considered using, but did use a variety of positive behavioral interventions and other means to control and address J.W.'s negative targeted behaviors. And, unlike in *B.H.* or *Covington*, here there was genuine dispute as to whether J.W. was regressing, whether his behaviors were in fact escalating in any significant way, and whether the strategies being employed were effective.[8]  Regardless, the team continued to respond to the parents' concerns, worked to address J.W.'s target behaviors, adjusted the interventions as needed, and implemented a number of supports in an effort to maximize the effectiveness of J.W.'s programming.

Mrs. Ward admitted the team made a concerted effort, based on the parents' concerns, to work in a consistent way with J.W.'s behaviors. (Tr. at 354.) Even Dr. Meinhold agreed the team was using a number of positive behavioral supports to deal with J.W.'s behaviors, including visual schedule, token reinforcement, verbal praise, task performance in small increments, and Picture Exchange Communication System ("PECS"), among others. (Tr. at 655–63.)  She merely disagreed with their methods. (Tr. at 590–92.)  The evidence establishes that the District met its obligation under the IDEA. Plaintiffs' argument fails.

d.     *FBA functions?*

Finally, plaintiffs assert that the functions identified in the 2004 FBA are not the same as

---

[8]  Although plaintiffs argue the types and frequencies of J.W.'s behaviors changed dramatically from 2006 through 2008, Ms. Scott testified that the types and frequencies of J.W.'s behaviors had remained fairly consistent from 2004 through 2008. (Tr. at 1687–89.)  And Ms. Barth testified that the types of behaviors had not changed from 2004 to 2006, and that she did not think the intensity or frequency had substantially changed. (Tr. 1961–65.)

those identified by plaintiffs' expert, Dr. Meinhold, and the "rational[e] used for discrediting Dr. Meinhold's FBA [fact that assessment was based on her observing J.W. for two hours in the home] was found to be unacceptable in *K.S. ex rel. P.S. v. Fremont Unif. Sch. Dist.*, 545 F. Supp. 2d 995 (N.D. Cal. 2008).

In *Fremont*, the court reversed the ALJ's judgment for the school district, in part on the basis that the ALJ's negative credibility determinations with regard to the student's witnesses were improper. In that case, the ALJ not only improperly relied on the school district's expert, it improperly found the student's witnesses to be less credible. Specifically, the court agreed with the student that the fact that the ALJ found the school district's witnesses more credible simply because they agreed with the school district's position constituted "a serious error in reasoning"; the ALJ's reasoning that the lack of extensive personal contact between parents' witnesses and the student made their analyses of the record less credible was arbitrary and capricious because it applied a separate and higher standard to the student's witnesses than to the school district's witnesses who also only analyzed the record; and the ALJ's negative credibility determination of the student's father based on his role as advocate for his daughter was inappropriate. *Fremont*, 545 F. Supp. 2d at 1004.

The circumstances here are distinguishable. There is no evidence that the hearing officer applied a different standard to plaintiffs' expert, or that she in any way found Dr. Meinhold's analysis of the record less credible due to her lack of extensive contact. Rather, the fact that Dr. Meinhold had limited contact with J.W.—and the fact that this contact was in the context of the home rather than the school environment— went to the weight given her ultimate conclusions based on those observations. Specifically, the hearing officer stated:

> Dr. Meinhold's FBA is not given significant weight because although she had
> the opportunity to observe [J.W.] in the school environment before preparing that

-24-

> assessment (Tr. 571–73), she instead observed him for two hours in his home.  (Tr.
> 582.)  Because she also conceded that behaviors are a function of one's environment,
> *i.e.*, behaviors observed in a home environment may not be the behaviors one would
> see in the school (Tr. 582), the reliability of her FBA is questionable.  In any event,
> her testimony reflected the unpredictable nature of [J.W.'s] behaviors . . . (Tr. 585.).

(Admin. Doc. 49, at 62.)

Here, the Tenth Circuit has repeatedly stated that this court is to give deference to a hearing officer's credibility judgment unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion, or unless the record read in its entirety would compel a contrary conclusion.  *O'Toole*, 144 F.3d at 699.  That is not the case here.  And even if the hearing officer inappropriately discredited Dr. Meinhold's FBA based on the limited time and the circumstances under which she spent observing J.W., plaintiffs offer nothing to suggest that any interpretation of her testimony reveals the IEPs to be fatally flawed or that the district otherwise denied J.W. a FAPE.

As discussed briefly above, the November 2004 FBA concluded that there were multiple functions to J.W.'s aggressive behaviors.  Dr. Meinhold's FBA report is consistent with this conclusion.  In fact, all testimony was consistent that the functions of J.W.'s behaviors are multiple and complex.

**C.     Did the 2006–07 IEP and 2007–08 IEPs Substantively Comply with the IDEA,**
**          *i.e.*, were they "reasonably calculated" to provide some "educational benefits?"**

Plaintiffs argue that the IEPs were not properly implemented.  In support, plaintiffs first generally point to the fact that J.W.'s self-injurious behavior increased and J.W. added a new type of self-injury: hand-biting, which was not present before February of 2007.  According to plaintiffs, the frequency of J.W.'s self-injurious behaviors increased, and he started having "rage incidents," requiring the addition of the "crisis procedure" to the BIP at the December 15, 2006 IEP meeting.

Plaintiffs then cryptically suggest that this "did not happen just because of J.W.'s autism or even just because of his inability to communicate." (Doc. 55 at 73.)

The court understands plaintiffs to argue that J.W.'s programming failed to provide him an educational benefit because it did not prevent his behaviors from substantially interfering with his learning. There is dispute on this point: Ms. Arnold testified that J.W. received educational benefit from the programming, and that his behaviors had no impact on his academic progress. Ms. Barth testified that, although there were "certain days when [J.W.'s] learning was more impaired by his behavior . . . but he continued to make academic progress." (Tr. 1912.) Drs. LaCava, Meinhold, and Simon all opined that J.W.'s behaviors were such that they interfered with his ability to learn and receive educational benefit from his programming.

However, this is not the standard by which the court evaluates compliance with the IDEA. In fact, the IDEA contemplates that some children will have behaviors that impede or interfere with their learning. 20 U.S.C. § 1414(d)(3)(B)(i) (requiring consideration of special factors in the development of an IEP for a child "whose behavior impedes the child's learning . . . ."). The IDEA does not require a school district to eliminate interfering behaviors. It requires only that the school district "consider the use" of positive behavioral interventions and supports to address the behavior. *Id*. As previously discussed, the District met this burden.

### 1.    September 15, 2006 IEP Program Modifications

Plaintiffs argue that the program modifications section of the September 15, 2006 IEP was not correctly implemented because (1) staff failed to provide a low sensory environment; (2) staff failed to use "errorless teaching methods" and instead used "prompting," which taught J.W. to rely on irrelevant cues; and (3) staff improperly used "token reinforcement" with non-mastered skills.

Plaintiffs assert that, as a result of these failures to implement J.W.'s IEP, self-injurious behaviors increased and J.W. regressed.  (*See* Doc. 55 at 73–82.)  Plaintiffs' contentions are not supported by the evidence.  And even assuming without deciding that the District did fail in effecting these three modifications, plaintiffs fail to establish that such failure affected J.W.'s substantive rights or otherwise resulted in an educational harm.

### 2.     Provision of Communication Systems and Devices

Plaintiffs also argue that, although use of a device for communication was "recommended" as early as November 2006 (Ex. 152, 47), the IEP team did not write a goal for use of the device until August 29, 2007; did not implement it until January 2008; and did not begin taking data on J.W.'s use of the device until March 12, 2008.  Plaintiffs fail to establish, however, how any delay in including a communication device in J.W.'s programming affected J.W.'s substantive rights or otherwise resulted in an educational harm.

### 3.     No meaningful educational progress

Finally, the court addresses plaintiffs' argument that J.W. made no meaningful educational progress and was therefore denied a FAPE.

Much of the testimony at the hearing and a great deal of the briefing in this action focuses on what progress J.W. made on the goals set out in his 2006–07 and 2007–08 IEPs.[9]  However, at this

---

[9]     Specifically, plaintiffs argue J.W. either regressed or made no progress on the following:
- restroom: 06/07 IEP Goal #1; 07–08 IEP Goal #17;
- typing: 06/07 IEP Goal #2; 07–08 IEP Goal #2;
- handwriting: 06/07 IEP Goal #3; 07–08 IEP Goal #12;
- block imitation: 06/07 Goal #4 (Discontinued b/c no progress);
- puzzles: 06/07 IEP Goal #5; 07–08 IEP Goal #5;
- imitate 12 motor activities: 06/07 IEP Goal #8; (discontinued b/c no progress);
- toy play: 06/07 IEP Goal #9; 07–08 IEP Goal #10;

(continued...)

stage in the analysis, the court asks whether the IEP was "reasonably calculated" to provide "educational benefit." *Rowley*, 458 U.S. at 206–07.  The Tenth Circuit employs the "some benefit" standard rather than the "meaningful benefit standard" although the difference between these standards is difficult to distinguish.  *See Sytsema*, 538 F.3d at 1313 n.7.  The educational benefit must be more than *de minimus*.  *Urban*, 89 F.3d at 726–27.

The issue of "meaningful educational progress"  was not specifically raised in plaintiffs' complaint, and regardless, there is no requirement that a child in fact make "meaningful educational progress" in order for the IDEA to be satisfied.  This inquiry is relevant to the court's IDEA analysis only to the extent that *de minimus* progress might be evidence that J.W. was deprived of a FAPE.  As the Supreme Court noted:

> By passing the Act, Congress sought primarily to make public education available to handicapped children.  But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful.  Indeed, Congress expressly "recognize[d] that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome." S. Rep., at 11, U.S. Code Cong. & Admin. News 1975, p. 1435.  Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.

*Rowley*, 458 U.S. at 192.

The IDEA requires access to specialized instruction and related services that are individually designed to provide educational benefit.  *Rowley*, 458 U.S. at 201; *O'Toole*, 963 F. Supp. at 1010.  Based on the evidence in this case, as discussed in this order, that standard was met.  The court is

---

[9]  (...continued)
- math: 06/07 IEP Goal #13 (discontinued b/c no progress);
- functional signs: 06/07 IEP Goal #17; and
- more or less: 06/07 IEP Goal #21.

sensitive to the parents' concerns for J.W. and their efforts on his behalf.   But "a school district is not required to provide every service that would benefit a student if it has found a formula that can reasonably be expected to generate some progress on that student's IEP goals." *Thompson R2-J Sch. Dist. v. Luke P.*, 540 F. 3d 1143, 1154 (10th Cir. 2008).   Nor does the district have to offer services "guaranteed to maximize the child's potential." *Johnson*, 921 F. 2d at 1029 (citing *Rowley,* 458 U.S. at 198).   And the IDEA "does not require defendant to utilize one proven teaching method over another." *O'Toole*, 963 F. Supp. at 1014.   In short, a school district satisfies its requirements under the IDEA if it offers individualized educational programming reasonably calculated to provide educational benefit, and the evidence in this case indicates that the District satisfied this requirement. J.W.'s parents had a full opportunity to participate in the IEP development process, and the services provided by the IEPs, including the behavioral components, were reasonably calculated to provide J.W. with educational benefits.   Plaintiffs fail to establish that J.W. was denied a free, appropriate, public education in violation of the IDEA.

**E.     KCATC**

Plaintiffs argue that KCATC is an appropriate private placement for J.W., primarily because it allows him to focus on imitation and social interaction skills with peers and siblings.   Plaintiffs discuss the IEPs implemented at KCATC and the progress J.W. has made there.   Plaintiffs assert that they paid $55,000 for the education J.W. received at KCATC.   Because the court concludes that J.W. was not denied a FAPE by the District, it does not address this claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Judgment on the Administrative Record (Doc. 32) is granted.

Dated this 27th day of February 2012, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**